[Cite as *State v. Walker*, 2021-Ohio-3860.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-20-1047

    Appellee                                 Trial Court No.  CR0201901366

v.

Malcolm Walker                            **DECISION AND JUDGMENT**

    Appellant                                Decided: October 29, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**OSOWIK, J.**

## I.  Introduction

{¶ 1} Appellant, Malcolm Walker, appeals the February 12, 2020 judgment of the

Lucas County Court of Common Pleas sentencing him to an aggregate prison term of 21

years to life following his convictions for murder, with a related specification for using a

firearm in the commission of the offense, and possessing a weapon while under disability.  For the following reasons, we affirm, in part, and reverse, in part, the trial court's judgment.

## A.  Facts and Procedural Background

{¶ 2} On March 1, 2019, appellant was indicted on one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified felony; one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D), a second-degree felony; and one count of having a weapon while under a disability in violation of R.C. 2923.13(A)(3) and (B), a third-degree felony.  Appellant's murder and felonious assault charge each included a related specification for displaying, brandishing, indicating possession of, or use of a firearm in the commission of the offense in violation of R.C. 2941.145(A), (B), (C), and (F).  The charges arose from the death of victim S.B. following an incident in which he was shot on February 20, 2019.  Appellant was arraigned on March 5, 2019.  At that time, he was determined to be indigent and appointed defense counsel.  He then entered a not guilty plea to all counts.

{¶ 3} Following pretrial motion practice and discovery, a four-day trial commenced on January 21, 2020.  During the state's case-in-chief, the parties elicited the following testimony and related evidence:[1]

_____

[1] For ease of reading, the summary of witness testimony is not presented in the order that the witnesses testified at trial.  Testimony not relevant to appellant's arguments on appeal has been omitted.

**Testimony of Officer Anthony Martin, Toledo Police Department**

{¶ 4} On February 20, 2019, Toledo Police Department Officer Anthony Martin was working an afternoon shift in field operations. His duties included traffic enforcement and responding to 911 calls. In that capacity, he responded to an emergency call indicating that someone had been shot at a residence at 1822 Glendale Avenue in Toledo, Lucas County, Ohio. The location was a two-story building with each floor divided into two apartments separated by a shared hallway. The scene of the incident underlying this appeal was one of the upstairs apartments.

{¶ 5} When Officer Martin arrived at the residence he was met by Ri.H. who informed Officer Martin that someone had been shot and needed assistance. Ri.H. directed Officer Martin to the apartment and informed him that the individual who shot S.B. was no longer at the scene. While Officer Martin was at the scene, a number of other officers arrived and began to secure the area.

{¶ 6} When Officer Martin entered the apartment he saw S.B. lying face down on the floor. Officer Martin observed S.B. moaning but unable to speak. Officer Martin observed what he determined to be gunshot wounds in S.B.'s chest and head. Witnesses C.W. and Ra.H. were in the apartment when Officer Martin entered. C.W. informed Officer Martin that he lived at the apartment complex. Officer Martin asked C.W. and Ra.H. who had shot S.B. but found them to be "very uncooperative." Officer Martin

believed that C.W. was intoxicated. Officer Martin was unable to obtain a description of the suspected shooter at that time.

{¶ 7} S.B. was taken from the scene via ambulance. Officer Martin then called the Toledo Police Department's detective bureau to advise any detectives assigned to the case of his observations. Officer Martin's involvement with the investigation concluded when the detectives arrived at the scene. Prior to leaving the scene, Officer Martin heard a radio call advising all officers that an individual with the nickname "ATL" was the suspected shooter. Officer Martin believed that Ra.H. provided this name to another officer. Officer Martin concluded his testimony by indicating that he left the scene and had no further involvement with the investigation.

**Testimony of Ra.H.**

{¶ 8} On February 20, 2019, Ra.H. resided at 1822 Glendale Avenue—the scene of S.B.'s shooting—with her brother, Ri.H., and her three children. The apartment contained a living room, a kitchen, and two bedrooms. One of the bedrooms had been converted into a recording studio. On the date of the incident, appellant had arrived at the apartment in the morning and began "drinking" and "making some songs" with Ri.H. and C.W.

{¶ 9} S.B. arrived at the apartment at approximately 7:00 or 8:00 p.m. and entered the studio. A short time later, S.B. and appellant exited the studio and went into the kitchen. Ra.H. observed them from the living room where she and her three children

4.

were watching television. Ra.H. then heard a disturbance in the kitchen. She opened the studio door and asked her brother and C.W. to get everyone out of the house. Ri.H. and C.W. went into the kitchen with appellant and S.B. and told them to calm down.

{¶ 10} As the individuals exited the kitchen Ra.H. saw appellant firing gunshots toward the living room. S.B. exited the kitchen into the living room and told appellant to stop and "you shot me already." Ra.H. then saw S.B. fall to his hands and knees as appellant approached him. Appellant then shot S.B. in the head and ran out the front door. Appellant fired one final shot in the shared hallway as he exited. Ra.H. noted that appellant carried an additional firearm "in his pants" during the altercation and as he exited. Ra.H. stated that she did not see S.B. in possession of a firearm during the incident. Ra.H. confirmed that appellant dropped a holster and cell phone, which were later discovered at the scene.

{¶ 11} After the police arrived at the scene, an officer spoke with Ra.H. She did not immediately identify appellant as the shooter. She testified that at the time she was too focused on comforting her scared children to provide that information. After she calmed down, she informed the officer of appellant's identity including his nickname "ATL." She was transported to the police station where she identified appellant as the shooter from a photo array lineup.

{¶ 12} On cross-examination, Ra.H. acknowledged that she had made prior statements when she was interviewed on the night of the incident, which were

inconsistent her trial testimony. Specifically, she expressed surprise to the responding officers when they informed her of the locations of S.B.'s wounds despite the fact that she was present for the shooting. Additionally, her trial testimony that her children were in the living room at the time of the shooting, did not match her statement on the night of the incident that her children had been in the bedroom at that time. Finally, she acknowledged that she initially informed the investigating officer that she did not see appellant carrying a weapon before subsequently stating that she saw him shoot S.B.

**Testimony of Detective Anthony Sosko, Toledo Police Department**

{¶ 13} Anthony Sosko is a member of the Toledo Police Department's detective bureau. In that capacity, he is sometimes asked to serve as the administrator of blind photo array lineups for crimes being investigated by other detectives. A photo array is a lineup of 6 photographs of individuals, one of whom is the person subject to the investigation, which is presented to a witness to determine if they are able to identify the suspect. The detective tasked with presenting the photo array is provided with the six photographs which are placed randomly in the lineup. The detective presenting the array is not told which photograph is of the suspect in order to avoid any influence over the witness' selection.

{¶ 14} Detective Sosko served in this capacity on February 20, 2019, at the request of Detective Holland. Detective Sosko was provided with 6 photographs

6.

including one of appellant to present to Ra.H. Detective Sosko presented the photo array to Ra.H. at 11:43 p.m. Ra.H. identified appellant as "the shooter" without hesitation.

**Testimony of Detective Martin Rocha, Toledo Police Department**

{¶ 15} At the time of the trial, Detective Martin Rocha was serving in his seventh year assigned to the Toledo Police Department's Scene Investigation Unit ("SIU"). As a member of the SIU, Detective Rocha was tasked with documenting crime scenes with photographs and reports as well as collecting evidence. Detective Rocha is tasked with identifying items of potential evidentiary value and securing those items for further investigation.

{¶ 16} Detective Rocha was serving in this capacity on February 20, 2019. That night, he was informed that a person had been shot and was called to the site of the underlying incident. At the time he arrived, S.B. had already been transported from the scene. Other Toledo Police officers that had arrived before Rocha were securing the perimeter of the scene to make sure no one else entered.

{¶ 17} Detective Rocha entered the scene and began taking photographs prior to the collection of evidence. As he identified items with potential evidentiary value, he placed a numbered placard in the area and photographed the item. The placing of numbered placards identifies the specific location from which the evidence was collected from the scene.

7.

{¶ 18} During his time on the scene, Detective Rocha collected 6 shell casings, a bullet, a cell phone, and a gun holster.  Three of the bullet casings were found in the kitchen.  Two of the bullet casings were found in the living room.  The final bullet casing was found in the hallway outside the apartment.  Detective Rocha discovered the bullet underneath the kitchen counter after having identified a bullet hole on the exterior of the cabinet.  Detective Rocha testified that the location of the bullet hole in the cabinet was consistent with someone firing a weapon from inside the kitchen toward the living room.

{¶ 19} When asked whether the evidence had been subjected to finger print analysis, Detetive Rocha stated that it had not.  He noted that he was unaware of a fingerprint ever having been identified for evidentiary purposes from a fired shell casing.  Additionally, fingerprints are used for identification purposes and were unnecessary in this instance as a suspect had already been identified.

**Testimony of Detective David Moford, Toledo Police Department**

{¶ 20} Detective David Morford is a member of the computer crimes unit of the Toledo Police Department.  He conducts forensic investigations on digital devices to assist detectives assigned to specific investigations.

{¶ 21} Detective Morford conducted a forensic investigation on two devices related to the incident underlying this appeal.  First, Detective Morford was asked to recover data from a mobile phone recovered from the scene.  He was able to recover three videos which were created on February 20, 2019.  All three videos were played for

8.

the jury but only the first and third video resulted in any questions from counsel. Detective Morford testified that he heard the first video conclude with a woman indicating that S.B. had arrived and a male voice responding that he should "come here." The first video was created at 8:01 p.m. The voices on the video were not identified. Detective Morford testified that the third video showed appellant sitting on the floor with two handguns between his legs. The third video was created at 8:19 p.m. Detective Morford confirmed that the 911 call reporting the shooting was made from a different phone at 8:55 p.m.

{¶ 22} Detective Morford also conducted a forensic analysis on a mobile phone which was recovered on February 22, 2019. The phone was collected from appellant when he was taken into custody on that day. Detective Morford's analysis showed that the phone had been activated at 9:37 P.M. on February 20, 2019. At 2:27 A.M. on February 21, 2019, a series of text messages from appellant and an individual named "Neesha" reflected that appellant desired to be picked up discretely and Neesha's reassurance that she would never turn him in. Text messages from the following day showed that appellant saw his face on the news in a story related to the shooting. The texts also show appellant planned on sending an associate out that night to pick up items that he needed so that he would not be seen in public.

**Testimony of J.B.**

{¶ 23} J.B. lives approximately one block away from the scene of the incident. On March 13, 2019, J.B. was cleaning up sticks from his yard when he discovered a firearm on the ground. Believing it to be a toy, he picked it up and realized that it was real. He placed the firearm back on the ground and called the Toledo Police. Two officers responded and, while there, discovered a second firearm in the yard. Both firearms were secured and collected by the officers. J.B. testified that although his yard was fenced in, he did not believe it would be difficult for someone to have thrown the firearms into his yard from the sidewalk.

**Testimony of Criminalist Kaitlin Porter, Toledo Police Department**

{¶ 24} Kaitlin Porter is a criminalist in the Toledo Police Department's forensics lab. Her primary duty is to determine the operability of firearms that are brought to her in the course of an investigation. She test-fired both firearms discovered at J.B.'s residence. She found them both to be operable, despite significant weathering, and fired two shots from each. The firearms, shell casings, and bullets from the test-firing were collected for further analysis.

**Testimony of Lab Administrator David Cogan, Toledo Police Department**

{¶ 25} David Cogan is the lab administrator in the Toledo Police Department's forensics lab. His primary duty is in firearms examinations. He was tasked with examination of the firearms discovered at J.B.'s residence and the related test-firing

10.

materials. Cogan testified that each firearm will create unique identifying marks on bullet casings and bullets once they have been fired. The distinguishing marks created by a semiautomatic pistol—the types of pistols recovered form J.B.'s yard—come from a mechanism called an extractor which pulls the spent casing from the chamber, an ejector which pushes the casing out of the firearm, and a firing pin which leaves a mark on the rear of the casing. Cogan determined that all six of the casings recovered from the scene of the incident were discharged from the firearms recovered at J.B.'s residence—two from one firearm and four from the other.

### Testimony of Cynthia Besser, M.D.

{¶ 26} Dr. Cynthia Besser is a forensic pathologist and deputy coroner in Lucas County, Ohio. She performed an autopsy on S.B. on February 21, 2019. She confirmed that S.B. suffered gunshot wounds to his right flank, left buttock, and head prior to his death. The gunshot wound to his right flank showed that the bullet entered through his right side, traveled through his liver and lungs, and exited through his chest on the left side. The gunshot wound to S.B.'s left buttock revealed that the bullet traveled through his bowel and lower abdomen before exiting through his left lower quadrant. The wound to S.B.'s head revealed that the bullet entered S.B.'s head above his right ear and traveled nearly straight down through his brain before settling into the occipital lobe on the base of his skull. Dr. Besser recovered the bullet from that location. She testified that the

gunshot wound to the head was consistent with S.B. having been shot from above while on his hands and knees.

{¶ 27} Having testified regarding each of the gunshot wounds identified in the autopsy, Dr. Besser testified that S.B.'s cause of death was multiple gunshot wounds. She determined that the manner of his death was a homicide.

**Testimony of Detective Richard Holland, Toledo Police Department**

{¶ 28} Detective Holland was the assigned lead detective in the death of S.B. While traveling to the scene after the initial report of the incident, Holland was advised that S.B. had been transported to the hospital and that two witnesses had been taken to the police station. He traveled there to conduct his initial interviews with the witnesses. Before arriving at the station, he was advised that appellant was being reported as a potential suspect.

{¶ 29} Detective Holland first spoke with Ra.H. Detective Holland described Ra.H. as fearful during the night of the interview. She was hesitant to participate because she believed it could adversely affect her children and their safety. Detective Holland noted that a photo array had been prepared to be shown to Ra.H. but that prior to her identifying appellant from the photo array, she showed Detective Holland a picture of appellant on her cell phone and stated "this is him, that's the guy who shot [S.B.]" Detective Holland also testified that Ra.H. identified appellant from the photo array as described in previous testimony.

12.

{¶ 30} Detective Holland next spoke with Ri.H. He described Ri.H. as uncooperative and was not asked for any additional details regarding his interview.

{¶ 31} After examining the evidence collected and reviewing the statements made by witnesses, Detective Holland sought and obtained an arrest warrant for appellant.

{¶ 32} Detective Holland was later advised of the results of the autopsy after it was conducted on February 21, 2019. The following day, he returned to the scene of the incident where he happened to encounter Ra.H. He then conducted a subsequent interview with Ra.H. At that time, Ra.H. provided additional detail regarding S.B.'s position at the time he was shot, specifically that he was on his hands and knees when appellant shot him in the head, a detail which she omitted in her initial interview. Detective Holland determined that Ra.H.'s statement about S.B.'s position at the time he was shot was consistent with the results of the autopsy.

{¶ 33} Appellant was arrested at a hotel early in the morning on February 22, 2019. When appellant was arrested he was in possession of the second cell phone examined by Detective Morford. Appellant also admitted that the other phone recovered from the scene of the incident was his. Detective Holland confirmed that markings on one of the handguns recovered from J.B.'s lawn matched markings on one of the handguns appellant possessed in the video recovered from his cell phone. Additionally, Detective Holland confirmed that each of the six shell casings recovered from the scene were fired by one of the two recovered firearms.

13.

{¶ 34} Detective Holland interviewed appellant after his arrest. A video of the interview was played for the jury at trial. Detective Holland testified that appellant admitted that he shot S.B. but that he did so in self-defense. Appellant told Detective Holland that he had previously been the victim of a robbery by one of S.B.'s associates. Appellant stated that he saw S.B. speaking to that associate on a video call earlier in the evening on February 20, 2019. He heard S.B. state that he was with appellant which made appellant fear that an additional altercation would occur with S.B. or his associate. Appellant stated that while he and S.B. were in the kitchen together later that evening they engaged in a physical altercation. Appellant alleged that S.B. pulled a firearm on him and that his only recourse was to shoot S.B. Appellant then fled from the scene. Detective Holland testified that appellant did not file a police report related to the alleged robbery by S.B.'s associate.

{¶ 35} Detective Holland also testified that appellant had previously been convicted of trafficking in heroin. As a result of that conviction, appellant was prohibited from possessing a firearm.

### Appellant's Crim.R. 29 Motion for Acquittal

{¶ 36} At the conclusion of Detective Holland's testimony, the state rested its case-in-chief. Appellant then moved for an acquittal pursuant to Crim.R. 29 arguing the state failed to produce sufficient evidence as to each element of the charged offenses. The trial court denied appellant's motion. Appellant then proceeded to present his case-

14.

in-chief.  After waiving his Fifth Amendment right against self-incrimination and affirming that he wished to testify, appellant offered the following testimony:

**Testimony of appellant, Malcolm Walker**

{¶ 37} Appellant testified that he arrived at the scene of the incident at approximately 7:30 P.M. on the evening of February 20, 2019.  That night he planned to make music with Ri.H. and C.W.  S.B. arrived at the residence approximately forty-five minutes later.  Appellant testified that shortly after he arrived, S.B. began waving a firearm around to let the individuals present know that he carried a firearm with him.  S.B. then put the firearm away and the group returned to making music.

{¶ 38} While he was recording music, appellant began filming videos he intended to post on social media as a means of promoting his music.  He acknowledged that these were the same videos subsequently downloaded from his phone which had already been played for the jury.  He stated that his possession of firearms in the video was intended to portray an image similar to that exhibited in other music videos available on social media.

{¶ 39} After filming his final video, appellant saw S.B. participating in a video call with an individual that had purportedly robbed appellant two days earlier.  S.B. informed this individual that appellant was at the residence.  Appellant testified that this alarmed him because he had received messages through his Facebook account that someone related to the robbery was looking for him and planning to kill him.  Appellant

15.

left the studio and went into the living room where he spoke with Ra.H. and started entertaining her children.

{¶ 40} A short time later, appellant returned to the studio. S.B. requested that they go to the kitchen to talk because the music was too loud in the studio. S.B. asked appellant whether there was a problem between him and the individual appellant alleged had robbed him. Appellant informed S.B. of the robbery and S.B. told appellant that the other individual would arrive soon and that appellant should meet him outside to settle their dispute. S.B. then pulled out a firearm from his own pocket and stuck it in appellant's face. While holding the firearm on appellant, S.B. took another firearm from appellant's pocket. Appellant believed that S.B. was attempting to rob him. A physical altercation ensued in which appellant ultimately took a firearm from S.B. During the altercation, the firearm discharged. S.B. then pointed the second firearm at appellant. Appellant alleges that S.B. shot himself in the side when he attempted to cock this second firearm. Appellant then fired a shot at S.B. and struck him in the buttock in an effort to get out of the kitchen.

{¶ 41} Appellant testified that the back door to the kitchen was locked and he had never seen it used. As a result, he was unsure if it was operable and he determined that his only means of exit from the apartment was through the front door. He pushed his way around S.B. and when he reached the front door he found it secured by a chain lock. He testified that he had to place the firearm still in his possession on the ground in order to

16.

disengage the lock and exit the apartment. He then ran through the door and away from the apartment having left the firearm inside the apartment. As he ran he heard additional shots being fired which he believed were aimed at him but he did not turn around to verify where they were coming from. He testified that he left the residence because he was afraid for his life. He also testified that no other individuals in the apartment saw the altercation or his exit as they were in different rooms.

{¶ 42} Appellant ultimately ended up at a hotel in Oregon, Lucas County, Ohio. The following morning he saw news coverage of the incident which identified him as a suspect in S.B.'s homicide. He testified that he intended to hire a lawyer to arrange a voluntary surrender to the police but he was arrested at the hotel before he could do so.

{¶ 43} On cross-examination, appellant essentially testified that Ra.H. was lying about witnessing S.B.'s shooting in the living room because she had been threatened by an unnamed individual. He also testified that one of the firearms he possessed in the third video played for the jury belonged to S.B. and that he returned it to him after he completed filming the video, despite having testified that he was afraid for his life having witnessed S.B.'s video call. He acknowledged that he sent the text messages related to his remaining in hiding the following day and that he never reported the basis for his self-defense claim—the altercation with S.B.—to the police prior to his arrest.

**Appellant's Renewed Crim.R. 29 Motion, Jury Verdict, and Sentencing**

{¶ 44} Appellant rested its case-in-chief at the close of his own testimony. Appellant renewed his Crim.R. 29 motion for acquittal arguing that the state failed to introduce sufficient evidence to support each element of the charged offenses. The trial court denied appellant's renewed motion. Following closing arguments, the matter was submitted to the jury for its deliberations. The jury returned a guilty verdict on all three counts.

{¶ 45} The trial court set a sentencing hearing for February 10, 2020. At that time, the trial court determined that appellant's felonious assault charge and murder charge were allied offenses of similar import pursuant to R.C. 2941.25. The state elected to have the trial court sentence appellant for the murder charge. The trial court imposed a prison term of fifteen years to life for S.B.'s murder with a mandatory, consecutive three-year prison term for the related firearm specification. The trial court also imposed a three-year prison term for appellant's conviction for possession of a firearm while under a disability. The trial court ordered appellant to serve the sentences for the murder and weapon possession convictions consecutive to one another, pursuant to R.C. 2929.14(C)(4), with both of those sentences to be served consecutive to the mandatory three-year prison term for the firearm specification. As a result of the consecutive sentences, appellant was ordered to serve an aggregate prison term of twenty-one years to life. Appellant's sentence was memorialized in a judgment entry dated February 12, 2020.

18.

## B. Assignments of Error

**{¶ 46}** Appellant timely appealed and asserts the following errors for our review:

1. The trial court imposed a consecutive sentence without making judicial findings in appellant's sentencing entry in violation of appellant's rights under R.C. 2929.14(C).

2. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Constitution of the State of Ohio.

3. The trial court erred in denying appellant's Crim.R. 29 motion.

4. The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

### A. The trial court failed to make all necessary findings required under R.C. 2929.14(C) to impose consecutive sentence

**{¶ 47}** In his first assignment of error, appellant argues that the trial court erred in failing to make all required findings under R.C. 2929.14(C) before ordering him to serve his prison sentences for murder and possessing a firearm while under a disability consecutively. We review felony sentences under R.C. 2953.08(G)(2). *State v. Goings*, 6th Dist. Lucas No. L-13-1103, 2014-Ohio-2322, ¶ 20. We may increase, modify, or vacate and remand a trial court's imposition of consecutive sentences only if we clearly

and convincingly find that: (1) "the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, * * * " or (2) "the sentence is otherwise contrary to law." *Id.*, citing R.C. 2953.08(G)(2).  The burden is on appellant to identify clear and convincing evidence in the record to show that the trial court erred in imposing his sentence.  *State v. Torres,* 6th Dist. Ottawa No. OT-18-008, 2019-Ohio-434, ¶ 6.

{¶ 48} Before imposing consecutive sentences, a trial court is required to make certain statutory findings under R.C. 2929.14(C)(4).  *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659.  R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 49} Put simply, this statute requires the trial court to make three statutory findings before imposing consecutive sentences. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 252; *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 26. It must find (1) that consecutive sentences are necessary to protect the public or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that the offender poses to the public; and (3) that R.C. 2929.14(C)(4)(a), (b), or (c) is applicable. *Beasley* at ¶ 252. "[T]he trial court must make the requisite findings *both* at the sentencing hearing and in the sentencing entry." (Emphasis in original.) *Id*. at ¶ 253, citing *Bonnell* at ¶ 37. While "a word-for-word recitation of the language of the statute is not required," a reviewing court must be able to discern that the trial court engaged in the

correct analysis and the record must contain evidence to support the trial court's findings. *Bonnell* at ¶ 29.

{¶ 50} Appellant argues that the trial court erred when it failed to incorporate its consecutive sentencing findings into the judgment entry. The state concedes that this constitutes error. Generally, "[a] trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a *nunc pro tunc* entry to reflect what actually occurred in open court." *Bonnell* at ¶ 30, citing *State v. Qualls,* 131 Ohio St.3d 499, 2012-Ohio-1111, 967 N.E.2d 718. The state requests we remand this matter for the limited purpose of issuing a *nunc pro tunc* entry to incorporate the findings made at the sentencing hearing. Our review of the record, however, shows that the trial court did not make each of the required findings necessary to impose consecutive sentences, thereby precluding this court from remanding solely for the issuance of a *nunc pro tunc* entry.

{¶ 51} At the sentencing hearing, the trial court stated:

[The sentences] will be served consecutive to one another as the court finds they are necessary to fulfill the purposes of Revised Code Sections 2929.11 and 2929.14(E) and not disproportionate to the seriousness of the offender's conduct or the danger the defendant poses. The court further finds to protect the public from future crime or to punish the offender as the

22.

harm caused was great or unusual such that no single prison term is

adequate.

The trial court clearly made two of the three required findings to impose consecutive sentences—that is, consecutive sentences were necessary to protect the public or punish appellant and that consecutive sentences were not disproportionate to appellant's conduct or the danger he poses to the public.

{¶ 52} The trial court's third finding referenced R.C. 2929.14(C)(4)(b) which requires a finding that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct." The trial court references the great or unusual harm resulting from appellant's multiple offenses. Absent from the record, however, is any reference to the trial court making the required finding that appellant's offenses were committed as part of one or more courses of conduct. Moreover, we are unable to identify any part of the record that suggests the court properly reached this conclusion and merely omitted its finding when imposing appellant's sentence.

{¶ 53} The failure to make the course of conduct finding pursuant to R.C. 2929.14(C)(4)(b) renders the imposition of consecutive sentences contrary to law. *See State v. Gessel,* 6th Dist. Williams No. WM-19-004, 2020-Ohio-40, ¶ 15 (holding that the

23.

failure to make the course of conduct finding before imposing consecutive sentences constituted reversible error). Therefore, because the trial court failed to make this required finding prior to imposing consecutive sentences, we find appellant's first assignment of error well-taken and remand this matter to the trial court for resentencing.

**B. Appellant's counsel was not ineffective for failing to file a motion to waive costs imposed by the trial court**

{¶ 54} In his second assignment of error, appellant argues that he received ineffective assistance of counsel when his trial counsel failed to file a motion to waive costs. At the sentencing hearing, appellant's counsel preemptively made an oral motion to waive any "court costs" the trial court might impose. He argued that the length of appellant's sentence precluded him from earning the money necessary to pay those costs and that he was previously determined to be indigent before that sentence was even imposed. The trial court did not rule on appellant's motion at sentencing.

{¶ 55} When discussing the imposition of costs, the trial court stated:

> The court has considered the defendant's present and future ability to pay, and after considering all relevant factors pursuant to Revised Code section 2941.51(B)—actually, you know, based on defense counsel's request today for costs to be waived, I'm going to take into consideration upon filing of that.

It is evident from this statement that the trial court did not actually impose any costs at the sentencing hearing. The trial court's judgment entry likewise failed to impose any

costs stating the "[c]ourt will defer full payment of costs awaiting any filing from counsel."

{¶ 56} Having reviewed the record, we find that the trial court never actually imposed the mandatory costs of prosecution pursuant to R.C. 2947.23 or any other discretionary costs on appellant. Clearly, trial counsel could not have offered ineffective assistance by failing to file a motion to waive costs which were not imposed. This issue, however, is moot in light of our resolution of appellant's first assignment of error in which we remanded this matter to the trial court for resentencing. The trial court's failure to impose costs or to resolve appellant's oral motion to waive those costs can be remedied at that time. For these reasons, we find appellant's second assignment of error is moot.

**C. The state introduced sufficient evidence to support appellant's convictions**

{¶ 57} In his third assignment of error, appellant argues that the state failed to produce sufficient evidence to support each element of his convictions for murder and for possessing a weapon while under a disability.[2] Specifically, appellant argues that the

---

[2] Appellant also argues that the state failed to produce sufficient evidence in support of his conviction for felonious assault. However, because the felonious assault count merged with the murder count and the state elected to have appellant sentenced for murder, he was not convicted of felonious assault. *See* State v. Whitfield, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 319 (holding that an offender is not convicted for offenses on which the jury returned a guilty verdict but was sentenced for an allied offense in spite of that verdict). Therefore, we limit our analysis to appellant's convictions for murder and possessing a weapon while under disability.

state failed to produce sufficient evidence that he did not act in self-defense. Before addressing the merits of appellant's argument, we must determine whether the state's obligation to introduce sufficient evidence to support the elements of the offenses for which appellant was convicted includes a requirement that the state introduce sufficient evidence to disprove appellant's self-defense claim.

{¶ 58} Generally, a challenge to the sufficiency of the evidence presented by the state does not require review of the state's evidence contrary to an affirmative defense. *See State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032. The guarantee that the state will produce sufficient evidence as to each element of the charged offense "does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." *Id.* at ¶ 37, citing *Caldwell v. Russell,* 181 F.3d 731 (6th Cir.1999). Instead, the presentation of an affirmative defense merely excuses a defendant's commission of the offense. *Id.* Put simply, the state is traditionally only required to introduce sufficient evidence that supports each element of the offense.

{¶ 59} However, the Ohio General Assembly recently amended R.C. 2901.05—the statute establishing the burden of proof on a self-defense claim—effective March 28,

26.

2019. The amendment included the following language regarding the burden of proof for a defendant's self-defense claim:[3]

> If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support the accused person used the force in self-defense * * *, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self–defense.

Appellant argues that under this newly-defined burden shifting analysis, this court must determine whether the state introduced sufficient evidence not only to support the charged offenses but also to disprove his self-defense claim. The state argues that this court's analysis should be limited only to the elements of the charged offenses without regard to appellant's self-defense claim. We agree with the state.

{¶ 60} "[T]he burden of proof encompasses two different concepts: the burden of production and the burden of persuasion." *State v. Petway,* 156 N.E.3d 467, 2020-Ohio-3848, ¶ 47. "The burden of production requires a party to come forward with or to produce sufficient evidence to make out a prima facie case." *Id.* "The burden of

---

[3] R.C. 2901.05(B), which went into effect after S.B.'s death but prior to appellant's trial shifted the burden of proof on self-defense claims to the state. We previously determined that R.C. 2901.05(B) applied to all trials after the effective date of the amendment. *See State v. Smith,* 6th Dist. No. , 2020-Ohio-5119. The applicability of the statute to post-amendment trials for conduct which occurred prior to the amendment is currently pending before the Ohio Supreme Court in *State v. Brooks,* Ohio Supreme Court case No. 2020-1250. *See 12/30/2020 Case Announcements,* 2020-Ohio-6834.

27.

persuasion is the requirement that a party must convince the trier of fact that a given assertion is supported by the quantum of evidence required under law." *Id.* Whether the state is obligated to introduce sufficient evidence disproving the elements of appellant's self-defense claim at trial is contingent on this important distinction.

{¶ 61} Under the current version of R.C. 2901.05(B), the state is not required to prove the defendant did not act in self-defense until that defendant introduces evidence that tends to support they acted in self-defense. In other words, the defendant maintains the burden of production on their self-defense claim before the state inherits the burden of persuasion. *Id.* at ¶ 55. In *State v. Messenger,* 10th Dist. Franklin No. 19AP-879, 2021-Ohio-2044, the Tenth District Court of Appeals considered the various burdens under the current version of R.C. 2901.05 as they relate to whether the state introduced sufficient evidence to support a conviction. There, the court held:

> Under the current version of R.C. 2901.05, while the burden of proof for the affirmative defense of self-defense has shifted to the state, the burden of production for all affirmative defenses, including self-defense, remains with the defendant. * * * Thus, if the state does not bear the burden of production on self-defense, it follows that sufficiency of the evidence is not the proper framework to review whether the state proved the absence of self-defense.

*Id.* at ¶ 44. "[T]here is nothing in the current version of R.C. 2901.05(B)(1) indicating that by shifting the burden of proof on the affirmative defense of self-defense, the General Assembly intended to transform the absence of self-defense into an essential element of a criminal offense." *Id.* at ¶ 43.

{¶ 62} We concur with the Tenth District's analysis. We find that because the burden of production for self-defense under R.C. 2901.05 remains with appellant, he cannot challenge his convictions based on the state's purported failure to introduce sufficient evidence disproving that defense. Therefore, we limit our review under appellant's second assignment of error to whether the state introduced sufficient evidence for each of the elements of the offenses charged and not whether there was sufficient evidence to disprove his self-defense claim.

{¶ 63} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 64} Appellant was convicted of murder in violation of R.C. 2903.02(B) which states "[n]o person shall cause the death of another as proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree [.]"  It is undisputed that S.B. died as a result of the gunshot wounds inflicted by appellant.  Therefore, the state introduced sufficient evidence supporting the murder conviction if the evidence supports that S.B.'s death was caused by appellant while he was committing or attempting to commit a violent first or second degree felony.  The predicate offense satisfying this requirement was appellant's felonious assault of S.B.  R.C. 2903.11(A)(2) defines felonious assault as "[causing or attempting] to cause physical harm to another * * * by means of a deadly weapon[.]"  Felonious assault is a second degree felony.  R.C. 2903.11(D)(1)(a).

{¶ 65} At trial, the Ra.H. testified that she saw appellant shoot S.B. in the head while he was on his hands and knees.  Appellant does not dispute that he used a firearm to shoot S.B.  R.C. 2923.11(B)(1)'s definition of "firearm" explicitly states that it is a "deadly weapon."  Therefore, Ra.H.'s testimony alone, viewed in a light most favorable to the prosecution, shows that a rational trier of fact could find that appellant committed a felonious assault which resulted in S.B.'s death.  Therefore, the state introduced sufficient evidence to support appellant's conviction for murder under R.C. 2903.02(B).

{¶ 66} Appellant was also convicted of possessing a firearm while under a disability pursuant to R.C. 2923.13(A)(3) and (B), which prohibits a person who has been

convicted of trafficking in any drug of abuse from possessing a firearm. Through the testimony of Detective Holland, the state introduced a certified copy of a judgment entry, without object from appellant, reflecting that appellant was convicted of trafficking in heroin on August 28, 2015. The state also introduced a video obtained from appellant's cell phone which showed him holding two firearms. The state, therefore, introduced sufficient evidence to show that appellant was prohibited from possessing firearms based on his prior conviction for trafficking in heroin and that he had been in possession of a firearm.

{¶ 67} In sum, we find that the trial court introduced sufficient evidence as to each element of appellant's convictions for murder and possession of a firearm while under a disability. Appellant's argument that the state failed to introduce sufficient evidence to disprove his affirmative defense is without merit as a matter of law and his third assignment of error is found not well-taken.

### D. Appellant's convictions were not against the manifest weight of the evidence.

{¶ 68} In his fourth assignment of error, appellant argues that his convictions were against the manifest weight of the evidence presented at trial. Specifically, he argues that the jury gave insufficient weight to his testimony that he acted in self-defense following an altercation with S.B. Had the jury properly weighed his testimony, appellant argues, it would have resulted in his acquittal.

31.

{¶ 69} "When examining whether a conviction was contrary to the manifest weight of the evidence, the appellate court serves as a 'thirteenth juror' to conclude whether the trial court lost its way so significantly as to result in a manifest miscarriage of justice, necessitating that the conviction be overturned." *State v. Butler*, 6th Dist. Lucas No. L-08-1390, 2010-Ohio-178, ¶ 11. "In reaching this determination, we grant substantial deference to the trial court's decision given its unique opportunity to consider the evidence presented and to closely observe and assess the demeanor and credibility of the witnesses." *Id.* We note that questions regarding the "weight and credibility of evidence are primarily for the trier of fact." *State v. Teal*, 6th Dist. Lucas Nos. L-15-1280 and L-15-1281, 2017-Ohio-7202, ¶ 58, citing *State v. Pena,* 6th Dist. Lucas No. L-12-1309, 2014-Ohio-423, ¶ 22. This court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st. Dist.1983). Upon review of the record, we find that the jury's verdict is not against the manifest weight of the evidence.

{¶ 70} At trial, Ra.H. testified that she saw appellant shoot and kill S.B. while he was on his hands and knees after having already been shot twice by appellant. Ra.H. testified that she saw appellant in possession of two firearms—one in his hand and one in his waistband—at the time he shot S.B. She also testified that after appellant shot S.B.

32.

and exited the apartment she heard an additional shot being fired in the hallway. The state elicited testimony from various forensic experts that established the five shell casings discovered inside the apartment, and the shell casing found in the hallway just outside the apartment, were fired from two firearms discovered in a yard a block away from the incident approximately one month later. Detective Holland testified that appellant was seen in possession of both of those firearms in a video created shortly before the shooting. Detective Holland testified that appellant did not have any injuries consistent with an altercation with S.B. He also testified that appellant never reported the alleged robbery which ultimately led to the alleged altercation with S.B.

{¶ 71} Appellant, in turn, testified that he acted in self-defense when he shot S.B. following an altercation between them in the kitchen of the apartment. His testimony relies solely on his own account of events since no one else witnessed the altercation. He also testified that he only shot S.B. twice during the altercation and that he dropped the only firearm he possessed at the time he exited the apartment.

{¶ 72} Having reviewed the record, we find that the state introduced compelling witness testimony and physical evidence which shows appellant intended to cause S.B. physical harm when he shot him. Appellant's own conduct—welcoming S.B. into the studio, filming a video about not being afraid of threats made against him, sitting in the living room entertaining Ra.H.'s children while he was supposedly afraid of being assaulted by S.B.'s associate—is not consistent with an individual acting in self-defense.

33.

{¶ 73} Essentially, appellant believes the jury should have found his testimony more credible than the testimony and evidence introduced by the state, and found that he acted in self-defense when he shot and killed S.B. The credibility of appellant's testimony is an issue for the jury to determine and we may only disturb the jury's assessment of his credibility "in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 386. In light of the testimony and evidence introduced by the state, and our own review of the evidence, we find that this is not an "exceptional case" which warrants reversal. The jury's verdict as to appellant's murder conviction was not against the manifest weight of the evidence.

{¶ 74} Appellant's brief extends his manifest weight argument regarding his claimed self-defense to his conviction for possession of a firearm while under a disability. Appellant's argument is without merit, however, because "self-defense is not available as a defense to having weapons while under disability as a matter of law where an offender possessed the weapon prior to the incident where alleged self-defense arises." *State v. Martz,* 163 Ohio App.3d 780, 2005-Ohio-5428, 840 N.E.2d 648, ¶ 41 (5th Dist.). By his own admission, appellant possessed the firearms while making a video on his cell phone, well before the altercation which he argues required his self-defense from S.B. Therefore, appellant has failed to identify any basis on which his conviction for possessing a weapon while under a disability was against the manifest weight of the evidence.

**{¶ 75}** In sum, the jury's verdict finding appellant guilty of murder and possessing a weapon while under a disability was not against the manifest weight of the evidence presented at trial. Appellant's arguments are without merit and his fourth assignment of error is found not well-taken.

### III. Conclusion

**{¶ 76}** We find appellant's first assignment of error well-taken and remand this matter for resentencing. Our resolution of appellant's first assignment of error renders his second assignment of error moot. We find appellant's third and fourth assignments of error not well-taken. Therefore, we affirm, in part, and reverse, in part, the February 12, 2020 judgment of the Lucas County Court of Common Pleas.

**{¶ 77}** Appellant and the state are ordered to split the costs of this appeal pursuant to App.R. 24.

Affirmed, in part, and
reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                 _____
                                               JUDGE

Thomas J. Osowik, J.


Myron C. Duhart, J.                    _____
CONCUR.                                               JUDGE


                                            _____
                                               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.