[Cite as *State v. Alves*, 2022-Ohio-4684.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 1-21-46

      v.

MICHELLE L. ALVES,                   **O P I N I O N**

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2020 0171

Judgment Affirmed

Date of Decision: December 27, 2022

APPEARANCES:

      *William T. Cramer* for Appellant

      *Jana E. Emerick* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Michelle Alves, appeals the September 24, 2021 judgment of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On June 2, 2020, Alves and her boyfriend, Clinton Owens, held a social gathering at their home at 413 Atlantic Avenue in Lima, Ohio. Alves and Owens hosted a barbeque in the evening and then the group continued to drink alcohol, use drugs, play cards, and gamble into the morning hours of June 3, 2020. At some point during the night, the group ran out of the ecstasy pills they had been taking, and a member of the group contacted Charles Sanders to bring more pills. Charles and his wife, Tarissa Sanders, arrived at house and after selling the pills to a member of the party, Charles contacted Owens and received permission for him and Tarissa to come into the home to drink, play cards, and gamble.

{¶3} At some point in the early morning hours of June 3, 2020, Javaris Newton, a friend of Owens and Alves who was at the gathering, observed Charles take Owens's gun, which had been sitting on the floor near the card table, and put it in the waistband of his pants. At this time, the individuals present at the residence were Alves, Owens, Newton, Desiree Cheatom (Newton's wife), Charles, and Tarissa.

{¶4} After observing Charles take Owens's gun, Newton texted Alves, who at that time was in her downstairs bedroom, and informed her that Charles put Owens's gun in the waistband of his sweatpants. Newton and Alves continued a text conversation for approximately 17 minutes. Alves then left her bedroom and approached Owens, asking him about the whereabouts of his gun. Then, Alves pulled a gun from behind her back, confronted Charles and Tarissa about Owens's gun, and shot them.

{¶5} Shortly thereafter, Newton called 911. Tarissa was pronounced dead at the scene, but Charles was transported to the hospital where he ultimately died.

{¶6} On August 13, 2020, the Allen County Grand Jury indicted Alves on two counts of murder in violation of R.C. 2903.02(A), (D) and R.C. 2929.02(B), unclassified felonies. Count One related to the death of Charles and Count Two related to the death of Tarissa. Each count also included a firearm specification pursuant to R.C. 2941.145(A). On August 20, 2020, Alves entered a written plea of not guilty.

{¶7} A jury trial was held on September 21-23, 2021. At the conclusion of the trial, the jury found Alves guilty of the counts and specifications in the indictment.

{¶8} The trial court proceeded immediately to sentencing, and sentenced Alves to a mandatory sentence of 15 years to life for each of Counts One and Two.

The trial court also sentenced Alves to three years in prison on each of the firearms specifications. The court ordered each of the sentences to run consecutively for an aggregate term of 36 years to life in prison.

{¶9} On October 8, 2021, Alves filed a notice of appeal. She raises two assignments of error for our review.

### Assignment of Error No. I

**The weight of the evidence does not support the conviction in Count One relating to Charles Sanders because the prosecution failed to prove beyond a reasonable doubt that appellant did not act in self-defense.**

{¶10} In her first assignment of error, Alves argues that her conviction on Count One, relating to Charles Sanders, was against the weight of the evidence. Specifically, Alves argues her conviction was against the manifest weight of the evidence because the weight of the evidence supported a finding of self-defense. For the reasons that follow, we disagree.

{¶11} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶12} Alves was convicted of murder pursuant to R.C. 2903.02(A) which provides that "[n]o person shall purposely cause the death of another * * *." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). Alves does not challenge any of the elements of the offense.

{¶13} With respect to Count One, the trial court also gave the jury an instruction regarding self-defense. Until recently, Ohio put the onus on the defendant to prove the elements of self-defense by a preponderance of the evidence. *State v. Messenger*, 10th Dist. Franklin No. 19AP-879, 2021-Ohio-2044, ¶ 36.

However, following revisions to R.C. 2901.05, the statute now "'place[s] the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt.'" *Id.*, quoting *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. Now the State is required "to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief [she] was in imminent danger of death or great bodily harm for which the use of deadly force was [her] only means of escape, OR (3) did violate a duty to retreat or avoid the danger." *Carney* at ¶ 31, citing R.C. 2901.05(B)(1).

{¶14} At trial, the court gave the jury the instruction that to disprove self-defense, the State had prove at least one of the following: (1) Alves was at fault in creating the situation giving rise to her shooting Charles, (2) Alves did not have reasonable grounds to believe she was in immediate or imminent danger of death or great bodily harm, (3) Alves did not have an honest belief, even if mistaken, that she was in imminent danger of death or great bodily harm, (4) Alves violated a duty to retreat to avoid the danger, or (5) Alves used unreasonable force.

{¶15} At the trial, the evidence demonstrated that Alves and Owens, Charles and Tarissa, and Newton and Cheatom were the only individuals present at the time of the shooting. (Sept. 21-23, 2021 Tr. at 190-191). Newton testified that at approximately midnight, the group ran out of the pills they were taking, so Newton

called Charles to purchase more. (*Id.* at 182-183, 217, 239). When Charles and Tarissa arrived outside the house, Newton met them outside. (*Id.* at 183-185). After obtaining permission from Owens, Charles and Tarissa came into the house to play cards. (*Id.* at 183). Throughout the night, those present drank alcohol, used drugs, played cards, and gambled. (*Id.* at 186, 222, 246, 249). According to Newton, when Charles and Tarissa arrived at the party, there was not any animosity. (*Id.* at 187-188). Rather, "[t]hey all were getting along and having a good time." (*Id.* at 188).

{¶16} At some point during the night, Alves and Owens got into an argument. (*Id.* at 188-189). As a result, Alves left the room with the card table and went into her downstairs bedroom. (*Id.* at 197). While Alves was in her bedroom, Newton observed Charles silently pick up Owens's gun off the floor and put it in the waistband of his pants. (*Id.* at 227-228).

{¶17} Newton then texted Alves to tell her what he saw. (*Id.* at 228-230); (State's Ex. 3). Newton and Alves engaged in a text conversation for approximately 17 minutes while Newton was seated at the card table with Tarissa, Charles, and Owens. (Sept. 21-23, 2021 Tr. at 228-230); (State's Ex. 3). During this text conversation, Alves indicated to Newton that she was going to check in on the situation in a few minutes. (Sept. 21-23, 2021 Tr. at 198-199); (State's Ex. 3). Newton stated that during this time, the card game remained "fun." (*Id.* at 229, 250).

{¶18} Shortly thereafter, Alves emerged from her bedroom and approached the card table where Newton, Owens, Tarissa, and Charles were playing cards. (Sept. 21-23, 2021 Tr. at 199, 226-227); (State's Ex. 135). Desiree was present in the house, but was in the laundry room tending to some laundry. (*Id.* at 227, 251-252). When Alves arrived in the living room, she asked Owens, "Where's your gun, stupid?" (*Id.* at 199). Owens responded that Alves should not worry about his gun. (*Id.* at 230-231).

{¶19} At this point, Newton, who knew that Alves and Owens owned a number of guns, ran from the room. (*Id.* at 200-201). Newton explained that he felt that, by Alves saying something to Charles, "something was going to initiate." (*Id.* at 200). Desiree and Newton fled the house as they heard gunshots coming from the room with the card table. (*Id.* at 201-202, 253). Newton reentered the house a short time later and found Alves standing inside holding a gun. (*Id.* at 203). Alves told Newton, "They tried to rob me." (*Id.*). Newton stated that the gun he saw in Alves's hand was not the same gun that he saw Charles pick up from the floor. (*Id.* at 207). Upon encountering Alves, Newton again fled from the house. (*Id.*). A short time later, Newton reentered the house for a second time and saw "a lot of blood" and Charles and Tarissa slumped on the ground. (*Id.* at 208). Then, Newton called 911. (*Id.*); (State's Ex. 4).

{¶20} State's Exhibit 135, which was a video copy of law enforcement's interview with Alves, was played for the jury. In the interview, Alves stated that she had lived at 413 Atlantic Avenue since January or February of 2020, and during that time the residence had been broken into "at least" five times. (State's Ex. 135). As a result of the series of break-ins, Alves had at least four guns stolen from her. (*Id.*).

{¶21} Alves stated that she had been in her bedroom for approximately ten minutes when Newton sent her text messages informing her that Charles put Owens's gun in the waistband of his pants. (*Id.*). Alves said that she waited a few minutes, loaded four bullets into her gun, and left her bedroom. (*Id.*). Alves said that she approached the card table with her gun behind her back and asked Owens where his gun was. (*Id.*).

{¶22} Then, Alves pulled out the gun, stepped around the table, and instructed Charles and Tarissa to put the gun on the table. (*Id.*). According to Alves, Charles and Tarissa laughed and then made a motion. (*Id.*). Alves interpreted the motion to mean that they were reaching for Owens's gun, and she shot them both. (*Id.*). Alves admitted to shooting Charles once in the head and shooting Tarissa a number of times. (*Id.*).

{¶23} On several occasions during the interview, Alves expressed her anger and frustration at her house being broken into and her guns being stolen. (*Id.*).

Alves made statements such as, "It was just so much all at once and I was just so tired of everybody stealing from me," and "[Charles taking the gun] made me mad. I just keep taking losses. * * * Now I have nothing." (*Id.*). Alves also admitted during her interview with police, "I don't even know if he really had my gun or not." (*Id.*).

{¶24} When law enforcement officers and emergency medical services workers arrived at the crime scene, they noted that Charles still had a pulse, and needed to move him so that he could receive medical attention. (Sept. 21-23, 2021 Tr. at 311). Patrolman Rachel Scott stated that when she checked for Charles's pulse, she observed that Charles had a clear white baggie containing a white substance in his right hand. (*Id.*). According to Patrolman Scott, when medical personnel moved Charles, the baggie fell out of his right hand and onto the floor. (*Id.* at 311-312); (State's Ex. 13). Patrolman Scott also testified that after Charles had been moved, she observed a firearm on the floor. (Sept. 21-23, 2021 Tr. at 312); (State's Ex. 12). The gun had been underneath his right leg, but it was not visible until Charles was removed from the scene. (Sept. 21-23, 2021 Tr. at 312); (State's Exs. 11, 12). During the course of the investigation, detectives determined that Charles was right handed. (Sept. 21-23, 2021 Tr. at 419).

{¶25} In her appellate brief, Alves argued that she was not at fault in creating the situation that gave rise to the shooting. Specifically, Alves argued that Charles

created the situation by trying to steal Owens's gun. Alves stated that she "had every right to confront him and demand that he give it back." (Appellant's Brief at 11).

{¶26} Based on the evidence presented at trial, the jury could have concluded that although Charles may have attempted to steal Owens's gun, Alves created the situation that gave rise to the shooting.

{¶27} The evidence established that Alves was in her bedroom and not in the room with the card table when Charles picked up Owens's gun and put it in his waistband. Moreover, according to Newton, who was in the room while Charles had the gun in the waistband of his sweatpants, the atmosphere of the party continued to be light. According to Newton, who was playing cards with Charles, Tarissa, and Owens immediately before the shooting, when Alves confronted Owens and Charles about the whereabouts of the gun, he began to feel unsafe and fled the room.

{¶28} Additionally, there was no evidence that, other than picking up the gun from the floor and putting it in his waistband, Charles touched, brandished, or spoke about the gun. However, Alves chose to load her gun with four bullets and confront Charles about stealing Owens's gun.

{¶29} Furthermore, even if Charles did make a "motion" reaching for the gun, he did not make the motion until Alves pointed a loaded gun at him and

demanded that he put Owens's gun on the table. Accordingly, we find that the jury could have found that Alves created the situation that gave rise to the shooting.

**{¶30}** Alves also argues that she acted reasonably and had an honest belief in the need for self-defense when she shot Charles. Alves contends that Charles, a known drug-dealer, was trying to steal a loaded gun. Alves argues that she acted reasonably by shooting Charles because he laughed at her and made a sudden movement when she asked him to put the gun on the table.

**{¶31}** However, the evidence presented at the trial could have led a reasonable jury to conclude that Alves's decision to shoot Charles was not reasonable and was not based on an honest belief in the need for self-defense. In her interview with law enforcement, Alves stated that Charles made a motion after she asked him to put the gun on the table that led her to believe that he was going to shoot her. However, another explanation for Charles's motion was that he was attempting to comply with Alves's demand that he put the gun on the table. Additionally, law enforcement officers' testimony regarding the baggie of suspected drugs found in Charles's dominant hand when he was removed from the scene could have cast into doubt the veracity of Alves's statement that Charles was reaching for the gun when she shot him.

**{¶32}** Moreover, Alves's statements relating to the anger caused by the repeated thefts from her home and her anger that Charles laughed at her when she

asked him to return the gun could have allowed the jury to believe that Alves shot Charles because she was angry at him for stealing from her home rather than fear for her life. This finding is supported by Alves's own statement that when Newton asked her not to shot him, she responded with, "Why would I shoot you? * * * You didn't steal my shit." (State's Ex. 135). Thus, the evidence presented at the trial could have led a reasonable jury to believe that Alves's decision to shoot Charles was not reasonable or was not based on an honest belief in the need for self-defense.

{¶33} Accordingly, after reviewing the evidence, we find that a reasonable jury could have found that Alves did not act in self-defense.

{¶34} Alves first assignment of error is overruled.

**Assignment of Error No. II**

**The trial court erred by refusing to instruct the jury on self-defense on count two relating to Tarissa Sanders.**

{¶35} In her second assignment of error, the Sanders argues that the trial court erred by denying her request for a self-defense instruction on Count Two, which relates to Tarissa. We disagree.

{¶36} "Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder." *State v. Shine-Johnson*, 10th Dist. Franklin No. 17AP-194, 2018-Ohio-3347, ¶ 25. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and

-13-

if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. Yet, a trial court may refuse to issue a requested jury instruction if "'the evidence adduced at trial is legally insufficient' to support it.'" *State v. Juntunen*, 10th Dist. Franklin Nos. 09AP-1108 and 09AP-1109, 2010-Ohio-5625, ¶ 13, quoting *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist.1993). "[T]he trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction." *State v. Fulmer*, 177 Ohio St.3d 319, 2008-Ohio-936, ¶ 72. Accordingly, "[a] court reviewing a trial court's refusal to submit to the jury a requested instruction must determine whether the trial court's decision constituted 'an abuse of discretion under the facts and circumstances of the case.'" *Juntunen* at ¶ 13, quoting *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion is more than a mere error in judgment; it suggest that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶37} As we stated in our discussion of Alves's first assignment of error, until recently, Ohio put the onus on the defendant to prove the elements of self-defense by a preponderance of the evidence. *State v. Messenger*, 10th Dist. Franklin No. 19AP-879, 2021-Ohio-2044, ¶ 36. However, following revisions to R.C. 2901.05, the statute now "'place[s] the burden on the prosecution to disprove at least

one of the elements of self-defense beyond a reasonable doubt.'" *Id.*, quoting *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. However, "[u]nder the current version of R.C. 2901.05(B), the state is not required to prove the defendant did not act in self-defense until the defendant introduces evidence that tends to support they acted in self-defense." *State v. Walker*, 6th Dist. Lucas No. L-20-1047, 2021-Ohio-3860, ¶ 61. "In other words, the defendant maintains the burden of production on their self-defense claim before the state inherits the burden of persuasion." *Id.*, citing *State v. Petway*, 11th Dist. Lake No. 2019-L-124, 2020-Ohio-3848, ¶ 55.

{¶38} After reviewing the evidence presented at trial, we find that the trial court did not abuse its discretion by denying Alves's request for a jury instruction of self-defense with respect to Tarissa.

{¶39} Alves's argument that the trial court should have given the jury a self-defense instruction with respect to Tarissa is apparently based on Alves's statement to law enforcement officers that Tarissa and Charles made a quick motion when Alves pointed her gun at them and requested that they give back the gun. Indeed, State's Exhibit 135 does show Alves making this statement to investigators.

{¶40} However, later in the interview, Alves admits that she did not see Tarissa make any movement and that she became upset when Tarissa laughed at her. (State's Ex. 135). Alves further admitted that she "went too far" by shooting

Tarissa, and she conceded that the reason that she "panicked" after the shooting was because she realized that she had gone "too far." (*Id.*). Alves further stated "[t]here wasn't really no [sic] reason" that she shot Tarissa. (*Id.*). She also conceded that the movement that Tarissa made was not a furtive moment, but rather that Tarissa "moved like [she was] shocked." (*Id.*).

{¶41} Accordingly, after reviewing the evidence presented at trial, we do not find that the trial court abused its discretion by denying Alves's motion for a self-defense instruction with respect to Count Two.

{¶42} Alves's second assignment of error is overruled.

{¶43} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**