[Cite as *State v. Jefferson*, 2022-Ohio-3448.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. Earle E. Wise, P.J. |
| Plaintiff - Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| EARL C. JEFFERSON, II, | : | Case No. 2021 CA 0081 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Richland County
Court of Common Pleas, Case No.
2020-CR-0775

JUDGMENT:    Affirmed

DATE OF JUDGMENT:    September 29, 2022

APPEARANCES:

For Plaintiff-Appellee            For Defendant-Appellant

GARY D. BISHOP                MATTHEW J. MALONE
Prosecuting Attorney            10 East Main Street
Richland County, Ohio            Ashland, Ohio 44805

JODIE SCHUMACHER
TERI BURNSIDE
Assistant Prosecuting Attorneys
Richland County Prosecutor's Office
38 South Park Street
Mansfield, Ohio 44902

*Baldwin, J.*

{¶1}   Defendant-appellant Earl Jefferson, II appeals his conviction from the Richland County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On January 7, 2021, the Richland County Grand Jury indicted appellant on one count of aggravated murder in violation of R.C. 2903.01(A) and 2929.02(A), an unclassified felony, one count of  aggravated murder in violation of R.C. 2903.01 and 2929.02(A), an unclassified felony, two counts of aggravated burglary in violation of R.C. 2911.11(A)(1) and 2911.11(B), felonies of the first degree, one count of murder in violation of R.C. 2903.02(A), 2903.02(D) and 2929.02(B), an unclassified felony,  and one count of attempted murder in violation of R.C. 2923.02/2903.02(A), R.C. 2903.02(D) and R.C. 2929.02(B), a felony of the first degree. Appellant also was indicted on two counts of felonious assault in violation of R.C. 2903.11(A)(2) and 2903.11(D)(1)(a), a felonies of the second degree, one count of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(D)(1)(a), a felony of the second degree, one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree, one count of domestic violence in violation of R.C. 2919.25(A) and 2919.25(D)(2), a misdemeanor of the first degree and one count of  tampering with evidence in violation of R.C. 2921.12(A)(1) and (2) and R.C. 2921.12(B), a felony of the third degree. The indictment also contained ten firearm specifications,

{¶3}   At his arraignment on February 3, 2021, appellant entered a plea of not guilty to the charges. Pursuant to a Judgment Entry filed on October 15, 2021, one of the charges of tampering with evidence was dismissed upon appellee's motion.

{¶4} A jury trial commenced on October 11, 2021. The following testimony was adduced at trial.

{¶5} Shaylee Wade testified that she had four children with appellant and that she had been in a relationship with him for 16 years. Appellant lived with Wade and the children. Wade testified that during the early morning hours of November 26, 2020, she and Dwayne Nabors were shot by appellant while they were trying to leave a hotel room.

{¶6} Wade testified that she was 14 years old when she first got together with appellant and that he was 27 at the time. At the time of the shooting, she was 29 and appellant was 43 years old. She described her relationship with appellant as "toxic" and testified that "it was hell,.." Trial Transcript at 257. She had their first child when she was 16 years old. Wade testified that she was the breadwinner in the family and had gotten her nursing license. Appellant would sometimes watch the children while she was working or going to school, but most of the time he would leave with his friends or cousins and "do his own thing pretty much." Trial Transcript at 258. The children were often left at the home of appellant's parents or the couple's oldest child would watch them. Wade testified that she tried to split up with appellant several times and had asked him to leave, but that appellant's name was on the lease so he never really left.

{¶7} There was testimony that five or six years before the shooting, Wade started sleeping upstairs in her daughter's bed. They lived in the same house, but led separate lives. She testified that about a month before the shooting, she caught appellant in a park with an 18 year old after tracking her car, which had been used by appellant, to the park via an OnStar app on her phone. Appellant ran away and did not stay, but the girl told

Wade that she had been with appellant the day before as well and laughed in Wade's face.

**{¶8}** Wade testified that she met Dwyane Nabors on Facebook and that she thought that they had mutual friends. Close to two months before the shooting, Nabors tried to get Wade to visit him in New Jersey where he was working. Wade told him that she could not visit him there because of her children. They were trying to see each other prior to the shooting and would often text. The first time that the two spoke or met face to face was on November 25, 2020. She described him as "very laid back, very positive" and a "caring" person. Trial Transcript at 268.

**{¶9}** On the evening of November 25, 2020, Wade was preparing for Thanksgiving. Wade indicated to appellant and her children that she needed to go to the store to grab a few items. She did not take her phone with her because appellant had taken her phone that day. She testified that appellant would look though her phone. Wade took her daughter's phone with her because she was planning on meeting with Nabors and needed a phone. She met Nabors at his business and the two arranged to get a motel room together. Wade went to the motel and checked into room 131 at around 8:30 p.m. She then called Nabors and told him that she was there and called her oldest daughter and told her that she was with one of her friends and would be home later. At the motel, Wade and Nabors talked, drank liquor, and eventually had sex. She testified maybe a year before, she had had intercourse with someone else before.

**{¶10}** At around midnight, the two were leaving the motel. Wade testified that earlier, at around 10:30 p.m., her phone, which was in appellant's possession, called Nabor's phone. Nabors looked at his phone and saw Wade's picture. When Nabors

answered the phone and said hello, no one on the other end of the line spoke and then the call ended. Wade testified that she did not have any suspicions that appellant was looking for her because they were both doing their own thing at the time and in her mind, the relationship had been over for years.

{¶11} When the two exited the motel room, Nabors was in front of Wade. When Nabors opened the door to leave, Wade heard multiple shots. She testified that Nabors put his hands up and said "whoa" twice. Trial Transcript at 285. Nabors then fell over and appellant came into the room and started shooting her. Appellant was not saying anything at the time. Wade testified that Nabors was trying to crawl over to her. After being shot multiple times by appellant, Wade asked him to stop but he would not. She then mentioned their children several times and appellant said "Look what you made me do." Trial Transcript at 286. Wade testified that she saw appellant shoot Nabors in the back of the head while Nabors was on the ground. Before leaving the room, appellant said that he was going to kill himself.

{¶12} Wade testified that she then crawled over to the phone in the room, but that all she heard was beeping because it was unplugged. She called 911 using Nabors's phone. Wade testified that she had nine wounds and had been shot one time in her left knee, three times in her groin area, four times in her abdomen, and once in her buttocks. She had to have a colostomy bag and had to have a hysterectomy. She then had surgery to repair her colon and remove the bag. In all, Wade was in the hospital for 21 days. On the day of her discharge from the hospital, one of the bullets in her left side had worked its way out and had to be cut out. Nabors died as a result of his injuries. Wade testified that neither she nor Nabors had a gun on their person.

{¶13} Officer Thayne Telquist, who is with the Mansfield Police Department, testified that he responded to the scene. He testified that the door to the room was open and that he observed Wade laying across the threshold of the door holding her stomach and bleeding. There was a lot of blood. He also observed an unresponsive man in the room. When he asked Wade who had shot her, she said that the shooter was appellant. She indicated that he was the father of her children and gave out appellant's address. Officer Telquist testified that he found a couple of shell casings south of the door on the right hand side. He further testified that tires had been slashed on a white vehicle and a pickup truck in the parking lot. The vehicles belonged to Wade and Nabors.

{¶14} Larry Schacherer testified that he was a Detective with the Mansfield Police Department and was at the station when appellant turned himself in later in the day. He testified that appellant was "upset, crying, nervous." Trial Transcript at 400. He further testified that he assisted Detective J. Mark Perry in getting a gunshot residue kit from appellant.

{¶15} George Edward Staley, Jr. who is with the Ohio Bureau of Criminal Investigation, testified that he photographed and examined the scene. He testified that he found numerous shell casings inside and outside the motel room and numerous shell fragments inside the room. He testified that Nabors had keys clenched in his hand and that the phone was on the floor. There was testimony at trial that Nabors's case of death was multiple gunshot wounds. According to forensic Pathologist Bryan Casto, Nabors was shot in the back of the head, the left upper lip area, the back of his left forearm, in the front of his right forearm, in the left side of his abdomen, and once in each thigh.

{¶16} Detective J. Mark Perry of the Mansfield Police Department testified that he was the lead investigator for the incident. He testified that six shell casings were collected and that while three were outside on the sidewalk outside the door, the others were within the motel room. There were no weapons at the crime scene and the tires were slashed on both Nabors's and Wade's vehicles. As part of his investigation, Perry also reviewed the surveillance video provided by the motel. He testified that appellant was first shown on the video at 12:49 a.m. on November 26, 2020. Appellant went out of camera view and then showed up on the other side near room 131 . He further testified that the video showed a Chevy Cruz driven by appellant driving into the motel's parking area at 12:44 a.m. on November 26, 2020. Appellant was observed parking next to Wade's vehicle and attempting to peer into room 131. He then walked back to Wade's car.

{¶17} Perry testified that appellant then left the motel facility at approximately 12:52 a.m. on November 26, 2020 and came back to the motel facility at 1:00 a.m.  At approximately 1:02 a.m., appellant walked around Wade's car and slashed her tires and about four minutes later, slashed Nabors's tires. At 1:04 a.m., appellant appeared back in front of room 131 again and was still in front of the room at 1:30 a.m.   Appellant began shooting outside the room at 1:32 a.m. and 48 seconds and was inside the room at 1:32 a.m. and 50 seconds. Appellant then exited the room at 1:35 a.m. and 28 seconds and then went right back in at 1:35 a.m. and 32 seconds. Appellant fled southwest to the back of the building and left in the Chevy Cruz at 1:36. a.m. In total, appellant was on the motel property for 8 minutes and 32 seconds before the shooting and a total of 40 minutes from the time that he arrived until he arrived the second time. Between 1:00 a.m. and 1:36 a.m., no car other than the Chevy Cruz came in or out of the motel property.

**{¶18}** Appellant testified at trial that on the evening of November 25, 2020, he started worrying about Wade after he realized that the store was closed and went out to look for her. He testified that he used GPS to find out where her car was located and then went to the motel using a borrowed car since Wade had taken the only family vehicle. Appellant testified that he probably had a gun with him because he always carried a gun. He testified that he saw Wade's car, walked around the parking lot, and then slashed the tires on her car and the tires on a white truck. He then went to the door of the motel room and sat at the door while listening. Appellant testified that he heard Wade having sex. The following testimony was adduced when he was asked what happened next:

**{¶19}** A. I don't know. It was like the door opened and I didn't know who it was until the door opened. Then all I remember is him stepping back, saying, "Hey, hey, hey, he got it." He was smiling and laughing. Then I looked at Shaylee, and she was looking at him and she was smiling. And I just, I don't know. I just lost control.

**{¶20}** Q. Do you remember calling the front desk?

**{¶21}** A. Yes.

**{¶22}** Q. Why did you call the front desk?

**{¶23}** A. Because I wanted to get help.

**{¶24}** Q. Did you - - what did you do next?

**{¶25}** A. After I made the phone call to the front desk, I was talking to Shaylee for a little bit. Then I waited until I heard sirens. I waited until I knew help was on the way, and I told her I was about to go kill myself. And that's why I left.

**{¶26}** Trial Transcript at 614. He testified that he loved Wade unconditionally and that most of their fights were from her cheating. Appellant testified that they were going to get married.

**{¶27}** On cross-examination, appellant admitted that after verifying Wade's location at the motel, he left for eight minutes to try to cool off. He then returned to the motel at 1:00 a.m. and did not leave the property until 1:36 a.m. after calling for help. Appellant testified that after slashing the tires, he could have left and gone home but went and stood outside room 131 for over 25 minutes. According to him, he "could not tear myself from the scene." Trial Transcript at 636. Appellant testified that when the motel room door opened, Nabors jumped towards him and he was scared and fired the first shot and then "just lost it." Trial Transcript at 637. He testified that he never aimed at Wade, but that she was shot because when he was shooting at Nabors, they were right in front of each other. Appellant denied shooting Nabors in the back of the head while Nabors was laying on the ground. Appellant admitted that he called the front desk and asked them to call 911 to get help and then fled. He did not dispute that he shot Nabors seven times or that he shot him in the face or the back of the head or that he shot Wade four to five times. He claimed that he did not aim at Wade. Appellant turned himself in almost 14 hours later after driving around and thinking about what had happened. He testified that he threw his gun, a .40 caliber handgun, in a dumpster. The gun was never recovered. Appellant testified that he "wasn't in [his] right mind" and had "no control over myself that day." Trial Transcript at 650.

**{¶28}** Bureau of Criminal Investigation Agent Ted Manasian analyzed the gunshot residue test. He testified that particles that are characteristic of gunshot residue were identified on the samples taken from appellant. Trial Transcript at 462-463.

**{¶29}** Wade's personal cell phone, which had been in appellant's possession on the evening of November 25, 2020, was not returned by appellant and was never located.

**{¶30}** At the conclusion of the evidence and the end of deliberations, the jury, on October 18, 2021, found appellant guilty of all counts except the attempted murder of Wade. Appellant was sentenced on October 18, 2021.

**{¶31}** Appellant now appeals, raising the following assignments of error on appeal:

**{¶32}** "I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO ORDER A COMPETENCY EVALUATION OF APPELLANT."

**{¶33}** "II. APPELLANT'S CONVICTIONS FOR AGGRAVATED BURGLARY WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE. THEREFORE, HIS CONVICTION FOR FELONY MURDER IS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

**{¶34}** "III. APPELLANT'S CONVICTION FOR AGGRAVATED MURDER WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

**{¶35}** "IV. APPELLANT'S CONVICTION FOR MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶36}** "V. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO INSTRUCT THE JURY REGARDING SELF-DEFENSE."

I

**{¶37}** Appellant, in his first assignment of error, argues that the trial court abused its discretion when it failed to order a competency evaluation of appellant. We disagree.

**{¶38}** We review the decisions of the trial court regarding competency evaluations for an abuse of discretion. See, *State v. Dye,* 5th Dist. Licking No. 99–CA–2, 1999 WL 770619, (Sept. 2, 1999). In order to find that the trial court abused its discretion, we must find that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶39}** In determining whether a defendant is competent to stand trial, the test is " "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." ' " *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 32, citing *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995), quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). It is with this standard in mind that we review the evidence in this record to determine whether appellant raised a genuine question as to his competency to stand trial and whether the trial court abused its discretion by declining to order an evaluation.

**{¶40}** Appellant, in the case sub judice, filed a motion requesting a competency evaluation on October 6, 2021. A hearing on the motion was held on October 8, 2021. At the hearing, appellant testified that he dropped out of school in the tenth grade and that he had never been charged with a crime before. At the hearing, appellant testified that he had not been to any type of doctor in a long time. Appellant testified that, when asked

what type of penalty that he would get if convicted of aggravated murder, that it would be "[p]retty extensive." Transcript of October 8, 2021 hearing at 5.

{¶41} During the hearing, the following argument occurred on the record:

{¶42} MS. SCHUMACHER [ASSISTANT PROSECUTING ATTORNEY]: Additionally, Judge, we did - - obviously, we were in trial mode, focused on trial… proof beyond a reasonable doubt. When we received Miss Kaiser's motion, we did then kind of shift gears a little bit, try to get supporting evidence.

There was two phone calls that the Defendant had made in jail, and I'll present those to the Court as well. In those phone calls, you can hear the Defendant - - I will warn the Court it is very difficult to hear him. It is best heard with headphones. His voice maybe can be picked up a little bit better there. But in the - - I'll just mark it State's Exhibit 4, this phone call. The file path is marked 3274869 underscore 4669Q underscore 1062021. This was made to phone number 419 - - I can't read this - - 522-1090. You can hear that there's general discussion, and then the gist of the conversation is that it's normal, it's flowing, we understand where we're at, current time, place, those types of impressions. There's even a conversation about the Defendant indicating that if I were out, I wouldn't be sitting around doing nothing. I would be doing something. So not like a psychotic indication. He's present in the conversation. But, most notably, around the 15-minute mark, the Defendant starts talking about the State's witnesses and those that we subpoenaed, specifically asking that the person, the female, he's talking to actually call this person and see what she is going to testify to. She's got to show up on Monday, meaning there's awareness of the Defendant of something is happening on Monday. And I think he even specifically mentions the word "trial" or "court." Okay?

**{¶43}** THE COURT: Okay.

**{¶44}** MS. SCHUMACHER: The Defendant even says that that witness - - I believe her name is  - -  it might be Tia, as it comes across.  But he mentions that she had surgery, so there's even  - -  he's been keeping up in the present, in his present mind, following what is happening with people, understanding, making the connection in his own mind that if she is recovering from surgery, even the ability to come to court is in question.  He then finally ends that conversation with you got to make contact with her.

That phone call might not be as telling as the next phone call, Judge.  And I'll mark that State's Exhibit 5.  Again, we're talking with another female.  This file is 3272451 underscore 46692 underscore 1042021.  This is phone number 1-419-545-9287.  Here, the Defendant discusses visitors, visits with the female.  The female asks - -  or the Defendant states five minutes in, I have to go to court next week.  And keep in mind this is referencing - - this phone call occurred on October 4th of 2021, thereby making I have to go to court next week very relevant.  One week from the 4th puts that on October 11th.  The female asks the Defendant, Are you nervous?  Are you okay? He says, I don't know.  The Defendant says sometimes they give you a plea deal.  The Defendant says I talked about a plea deal, my lawyer came.  The female asks, Can you tell me more or no?  The Defendant is very quiet, yet, though, at six minutes, five seconds, I'm not going to tell nobody.  Other conversation continues about six minutes and 25 seconds.  Then the female asks, Is it a good deal or a bad deal?  The Defendant says, Bad.  Conversation goes on. Was it worse that what you were thinking you would get a trial?  Was it a never-ever-see-the-light-of-day plea?  The Defendant says, Promise not to tell nobody what I

say.  The female says, I ain't going to tell nobody.  They pinky swear, and he says, They offered me 42 years.

It is true, Judge, that the State never offered, quote, unquote, flat time at 42 years. But that conversation is very telling in the sense that there were pretrial negotiations between counsel indicating - -  where the defense had requested flat time.  If we're looking at the most egregious charges, our estimation is within the time frame of about 43 years to life.  And here the Defendant is recognizing - - he keyed up on that 42, so he's following along in these conversations and understanding the consequences, when you go back to it is a never-ever-see-the-light-of-day plea.

So when you're talking about a man who is 44 years old now getting an offer of - - quote, unquote, offer of 42 years, making him potentially 86 years old, there's a recognition that this is a never-ever type of plea offer.  There(sic) conversation continues, Judge, to the point of where they talk about usually this is a 25-to-life max.  The Defendant says, They expect you to take the deal; if you don't take the deal, they're going to double it if you go to trial.  So he is recognizing consequences of going to trial and accepting a plea.

Again, I'm highlighting this as when we're looking at a competency evaluation, is he understanding the proceedings against him, is he able to assist in his defense.  As he proceeds in that conversation, he talked about your lawyer couldn't get a better one, so we're recognizing roles and relationships in the courtroom, recognizing what his attorney is supposed to be doing for him.

He even comes back with the understanding they want, the people want, the death penalty.  That's significant as well, because prior to our hearing here today, very early on

in the case in that same conversation where I referenced that potential plea negotiation, what might be deemed a plea negotiation, it was explained from the family, like, if we even offer you the …. Minimum maximum of about 43 to life, the family still wants the death penalty, explaining that the family if very upset. So that was definitely conveyed to the Defendant. The Defendant was understanding that. And when he reiterates that several months later and tell this other female on the phone that they want the death penalty, I think there can be no doubt that the Defendant is certainly competent to stand trial at this point.

{¶45} THE COURT: Okay.

{¶46} MS. SCHUMACHER: They go on and explain even current legislation and talk about current legislation, talking about the abolishment of the death penalty and the house bill and specific house bill number that is currently pending with the legislation.

Finally, then, what was - - the State's understanding, and maybe defense wants to admit it as a joint exhibit. If not, I think the State will offer it - - is the Defendant's affidavit which apparently spurred this motion. And within that affidavit - - I'll just mark it as State's Exhibit 6, Judge. Within that affidavit, the Defendant talks about requesting a dismissal of the indictment because if failed to state an offense thereon. He explains that he hasn't had the opportunity to be confronted with the witnesses. I think the Court can go ahead and read it on its own time but you get the gist that he is making sound legal arguments, albeit at times he talks in terms of someone that might be considered a sovereign citizen.

So with that, based on the case law cited within our response to the Defendant's motion, I think the Court is well within bounds to find the Defendant competent, if the

Court interprets this motion as a competency motion, and even without a forensic evaluation. Your Honor.

**{¶47}** Transcript of October 8, 2021 hearing at 12-16. When asked by the trial court whether he would rather have a bench or jury trial, appellant indicated that he wanted to talk to his attorney.

**{¶48}** At the conclusion of the hearing, the trial court found appellant competent to stand trial, finding that he was capable of understanding the nature and objectives against him and of assisting in his own defense. The trial court, as trier of fact, was in the best position to assess appellant's credibility and competency. The evidence presented at the hearing did not overcome the presumption that appellant was competent to stand trial.

**{¶49}** We find, viewing the transcript, that the trial court did not abuse its discretion because the court's decision was not arbitrary, unconscionable or unreasonable.

**{¶50}** Appellant's first assignment of error is, therefore, overruled.

II

**{¶51}** Appellant, in his second assignment of error, argues that his convictions for aggravated burglary were not supported by sufficient evidence and that, therefore, his conviction for aggravated murder, which was based on his commission of the offense of aggravated burglary, was not supported by sufficient evidence. We disagree.

**{¶52}** On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶53}** Appellant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) and 2911.11(B). R.C. 2911.11 states, in relevant part, as follows:

**{¶54}** (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

**{¶55}** (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

**{¶56}** (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

**{¶57}** R.C. 2901.01 (A) defines force as meaning "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing".

**{¶58}** While appellant does not dispute that his entrance into the motel room was uninvited and without permission and thus the element of trespass was met, he specifically argues that there was no evidence that he entered the motel room by force, stealth or deception.

**{¶59}** However, at the trial, there was testimony that the surveillance video from the motel showed a muzzle flash when appellant began shooting before he entered the room. There was testimony that about 1:32 a.m. and 50 seconds, appellant shot in the

room before entering it. Three shell casings were found outside on the sidewalk. We find therefore, that there was sufficient evidence that appellant trespassed, by force, purposely entering the motel room, an occupied structure, shooting his way in, and when he inflicted harm by a deadly weapon. Appellant, by force, trespassed into an occupied structure.

{¶60} We find, therefore, that appellant's conviction for aggravated burglary was supported by sufficiency of the evidence.

{¶61} R.C. 2903.01(B) states as follows: "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape." Having found that appellant's conviction for aggravated burglary was supported by sufficient evidence, we find that his conviction for aggravated murder based on his commission of the offense of aggravated burglary was supported by sufficient evidence.

{¶62} Appellant's second assignment of error is, therefore, overruled.

III

{¶63} Appellant, in his third assignment of error, contends that his conviction for aggravated murder was against the sufficiency of the evidence. We disagree.

{¶64} Appellant was convicted of aggravated murder in violation of R.C. 2903.01(A) which states as follows: "[n]o person shall purposely, and with prior calculation

and design, cause the death of another or the unlawful termination of another's pregnancy".

**{¶65}** Appellant contends that the evidence was insufficient to show prior calculation and design. The Ohio Supreme Court held it is not possible to formulate a bright-line test to distinguish between the presence or absence of prior calculation and design, but instead each case turns on the particular facts and evidence presented at trial. *State v. Taylor*, 78 Ohio St.3d 15, 20, 1997-Ohio-243, 676 N.E.2d 82. In *Taylor v. Mitchell*, 296 F.Supp.2d 784 (2003), the habeas corpus action considered by the U.S. Northern District of Ohio Federal Court regarding the conviction reviewed by the Ohio Supreme Court in *Taylor*, *supra*, the federal court summarized Ohio law regarding prior calculation and design as follows:

**{¶66}** In view of the understandable lack of a bright line rule governing determinations of whether the proof shows prior calculation and design, Ohio courts have consistently considered various factors in addition to those - the defendant's relationship with the victim, the thought given by the defendant to the means and place of the crime, and the timing of the pertinent events - recited in *Taylor*, 78 Ohio St.3d at 19, 676 N.E.2d 82, when determining whether the defendant engaged in prior calculation and design.

**{¶67}** Among these other, frequently considered factors are:

**{¶68}** —whether the defendant at any time expressed an intent to kill.

**{¶69}** —there was a break or interruption in the encounter, giving time for reflection.

**{¶70}** —whether the defendant displayed a weapon from the outset.

**{¶71}** —whether the defendant retrieved a weapon during the encounter.

**{¶72}** —the extent to which the defendant pursued the victim.

**{¶73}** —the number of shots fired.

**{¶74}** {¶18} *Id.* at 821–822, internal citations omitted.

**{¶75}** The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including: (1) "evidence of a preconceived plan leading up to the murder"; (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded" or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 40.

**{¶76}** In the case sub judice, there was sufficient evidence to support a finding of prior calculation and design by appellant in the aggravated murder of Nabors. Appellant was aware that Wade was with another man and tracked her via GPS to the motel. He was angry that Wade was with another man and went to the motel with his gun and a knife. The gun was a .40 caliber semi-automatic. In order to get to the motel, he had to borrow a vehicle from his mother since Wade had taken the only family vehicle. After getting to the motel, where he was for approximately eight minutes the first time, appellant paced outside of the motel room then left for eight minutes. During such time, appellant drove around and then returned. As noted by appellee, this gave him time for reflection and consideration of his actions. Appellant, upon his return, slashed the victims' tires and waited some more. He testified that he stood outside the motel room and heard them having sex. Appellant had his gun on him at the time. He waited at the motel for over

25 minutes before the door to the room was opened and when the door was opened, he immediately opened fire. Nabors fell after being shot and crawled away from appellant, but appellant followed him into the room and continued shooting. Nabors was shot a total of seven times, including shot to the back of the head while he was on the floor.

{¶77} We find that there was sufficient evidence establishing prior calculation and design and that appellant's conviction for aggravated murder was not against the sufficiency of the evidence.

{¶78} Appellant's third assignment of error is, therefore, overruled.

IV

{¶79} Appellant, in his fourth assignment of error, argues that his conviction for murder was against the manifest weight of the evidence. We disagree.

{¶80} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶81} Appellant was convicted of murder in violation of R.C. 2903.02(A). such section states that "(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy". He maintains that he should have been

committed of voluntary manslaughter in violation of R.C. 2903.03(A) which states that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy." The jury was instructed on voluntary manslaughter.

{¶82} Appellant specifically argues that his will was overcome by a sudden fit of passion and rage and that he had no control over himself that day. Appellant alleges that he loved Wade unconditionally and that the two had recently recommitted to their relationship and were going to get married.

{¶83} However, as is stated above, Wade testified that in the years prior to the shooting, she started sleeping in her daughter's bed and that both she and appellant had cheated on each other multiple times. About a month before the shooting, Wade caught appellant in the park with an 18 year old. In addition, there was testimony that appellant, after tracking Wade to the motel, walked around the motel before leaving for the first time. He testified that he left the scene after being there eight minutes and drove down the street to try and cool off and that he was gone for eight minutes. He then drove back to the motel. Appellant admitted that he stood outside of the room for over 25 minutes after he slashed the tires on both vehicles.

{¶84} Once the door to the room opened, appellant started shooting at 1:32 a.m. and 48 seconds and continued shooting. He the exited the room at 1:35 a.m. and 28 seconds and then went right back into the room four seconds later. Appellant then exited

the property at 1:36 a.m. and 49 seconds. The following is an excerpt from Detective Perry's  testimony at trial:

**{¶85}** Q.  And from the 1:00 a.m. [when appellant returned to the property] until the shooting at 1:32 and some seconds, how many minutes go by?

**{¶86}** A.  32 minutes, approximately almost 33.

**{¶87}** Q.  So all total on Motel 6 property in the very early morning of Thanksgiving of last year, he was there eight minutes and 32 minutes before the shooting.  How many minutes all together?

**{¶88}** A.  From the time he arrived the second time?

**{¶89}** Q.  32 and 8.  Let me keep it simple for you.  32 and 8.

**{¶90}** A.  I'm sorry, you lost me.

**{¶91}** Q.  What is 32 plus 8?

**{¶92}** A.  It would be 40.

**{¶93}** Trial Transcript at 572.

**{¶94}** Wade testified that the last thing that she saw appellant do, before leaving the room, was shoot Nabors in the back of his head while Nabors was on the ground.

**{¶95}** We have reviewed the record in the case of sub judice and are not persuaded by appellant's contention that the jury's verdict led to a manifest miscarriage of justice. As we have often emphasized, the trier of fact, as opposed to this Court, is in a far better position to weigh the credibility of witnesses. *State v. Reardon*, 5th Dist. Tuscarawas No. 2001AP080082, unreported, 2002 WL 1025488, *2 (May 17, 2002), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Appellant thus has not

shown that "a miscarriage of justice" occurred or that the jury "lost its way" when it found him guilty of murder.

**{¶96}** Appellant's fourth assignment of error is, therefore, overruled.

V

**{¶97}** Appellant, in his fifth assignment of error, argues that the trial court abused its discretion by not instructing the jury on self-defense. We disagree.

**{¶98}** Appellant, in the case sub judice, did not request a jury instruction on self-defense and did not object to the trial court's failure to give one. Crim.R. 30(A) provides that a party may not assign as error the trial court's failure to give any jury instructions "unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." The failure to object to a jury instruction in accordance with Crim.R. 30(A) before the jury retires constitutes a waiver, absent plain error. *State v. Lynn*, 129 Ohio St.3d 146, 950 N.E.2d 931, 2011-Ohio-2722, ¶ 12.

**{¶99}** Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 436, 1997-Ohio-204, 678 N.E.2d 891. Courts should notice plain error, "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *Lynn* at ¶ 14.

The elements of a valid claim of self-defense are as follows: (1) the defendant was not at fault in creating the situation giving rise to the affray;

(2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger.

**{¶100}**        *State v. Petway,* 2020-Ohio-3848, 156 N.E.3d 467, ¶ 41 (11th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002-Ohio-68, 759 N.E.2d 1240, citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. Under the burden shifting framework outlined in the current version of R.C. 2901.05(B), which became effective on April 6, 2021, "the state is not required to prove the defendant did not act in self-defense until that defendant introduces evidence that tends to support they acted in self-defense." *State v. Walker,* 2021-Ohio-3860, 180 N.E.3d 60, ¶ 61 (6th Dist.), citing *Petway* at ¶ 55. Thus, "the defendant maintains the burden of production on their self-defense claim before the state inherits the burden of persuasion." *Id.*

**{¶101}**        The trial court, in indicating that it would not be giving an instruction on self-defense, stated, in relevant part, as follows:

[I]n listening to Mr. Jefferson's testimony, I would not be giving them the self-defense instruction. I don't think it's warranted, because to do that you have to say evidence was presented in support of finding that the Defendant used force in self-defense. There was no testimony whatsoever that Mr. Jefferson had any reason to believe that he was in imminent danger of death. He only said that Mr. Nabors might have made a step towards him, and, at that point, that's when he said he started shooting. For that reason, I would not be giving them that instruction regarding self-defense because

I don't think it's warranted because I don't think there was any evidence regarding self-defense.

**{¶102}** Trial Transcript at 656-657. Appellant testified at trial that when the motel room door opened, and Nabors saw him, Nabors stepped back and raised his arms. At the time, appellant had a loaded gun in his hand and Nabors and Wade were unarmed. There was testimony at trial that appellant began immediately firing his gun when the door to the motel room opened.

**{¶103}** We concur with the trial court and find no plain error in not giving an instruction on self-defense.

**{¶104}** Appellant's fifth assignment of error is, therefore, overruled.

{¶105}     Accordingly, the judgment of the Richland County Court of Common Pleas is affirmed.

By: Baldwin, J.

Wise, Earle, P.J. and

Hoffman, J. concur.